## Trainer, Appellant, *v.* Fort.

Argued January 6, 1933. Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY and LINN, JJ.

*E. A. Howell,* with him *Richard H. Woolsey* and *William L. Hammond,* for appellant, cited: Neiman v. Ebert, 47 Pa. Superior Ct. 7; Carter v. Moss, 210 Pa. 612; Dalmas v. Kemble, 215 Pa. 410; Weaver v. Craighead, 104 Pa. 288; Thomas v. Law, 25 Pa. Superior Ct.

572

19; Saxman v. McCormick, 278 Pa. 268; Collins v. Baumgardner, 52 Pa. 461; Stephens v. Sulkin, 280 Pa. 211.

*J. B. Colahan,* with him *Ralph N. Kellam* and *Irwin F. Holt,* for appellee, cited: Cunningham v. Smith, 70 Pa. 450; Baldus v. Jeremias, 296 Pa. 313.

OPINION BY MR. JUSTICE MAXEY, March 20, 1933:

Plaintiff brought suit against the defendant for a commission for the sale of certain real estate. The claim was based on an oral contract. Plaintiff declares in his statement that the defendant "orally covenanted and agreed to and with plaintiff that if the plaintiff would communicate to him [the defendant] the name of the corporation [which, according to plaintiff, had made inquiry of him for Delaware River frontage property], and would recommend the defendant's property to said corporation, if and when any part of the said property should be purchased by the said corporation, or any of its associated or subsidiary companies, the defendant would pay to the plaintiff a commission of two and one-half per cent on the total selling price." On July 21, 1925, the American Radiator Company agreed to buy "defendant's property" referred to for $525,000. The sale was made through Cross & Brown, real estate brokers affiliated with the Radiator Company. Plaintiff's claim for a commission being contested the case went to trial and he was awarded $18,212.98 as a commission. Defendant moved for a new trial and for judgment n. o. v. The court granted the latter motion. Plaintiff appealed.

The question now before us is whether or not the plaintiff made out a prima facie case for submission to the jury. He testified in substance as follows: On December 22, 1924, he telephoned defendant that he had "a real buyer for the Pusey & Jones property in Gloucester......before I give you the name, it is distinctly

understood between us, is it, that I will receive from you the usual commission paid brokers for selling such properties, five per cent......if the property in Gloucester, the Pusey & Jones—known as Pusey & Jones—is sold to......my prospect in its entirety or part." He testified that defendant replied: "Just as I wrote you, if you will look at the correspondence, I told you the matter of commission was a matter we would have to discuss and fix definitely when you had a prospect or something possible in the way of a buyer." He testified further that the defendant said: "I am part owner of this property and it makes no difference who buys or who sells it, there will be a commission of five per cent paid, and I have been designated as the exclusive selling agent, and therefore, I will receive one-half of the five per cent commission, and if the people you have in mind should buy, I will be glad to pay you the other two and a half per cent." The plaintiff said that he answered: "A half a loaf is better than none......I will have to be satisfied with two and a half per cent." He then informed the defendant that the prospective buyer was the American Radiator Company. The plaintiff testified that he said to the defendant: "You accept them as my customer under your two and a half per cent commission?" and the defendant answered: "Yes, gladly." The plaintiff then gave the defendant the names of three or four representatives of the American Radiator Company with whom he had been personally in contact prior to that time.

Plaintiff further testified that within ten minutes after the conversation, he sent a telegram to Leo A. Merryman, secretary to the vice-president of the American Radiator Company, but he did not have a copy of it. However, he offered in evidence a letter which he had written to Mr. Merryman on December 30, 1924. The following are excerpts from this letter: "When I wired you on December 22nd I had in mind the plant of the Pusey & Jones Co., at Gloucester, N. J. ...... This

plant......commands a magnificent water-front on the Delaware River. ...... When I wired you on December 24th I had in mind the largest and best Foundry in CHESTER. ...... Beyond a doubt CHESTER will be found to be the best place on the Atlantic Seaboard for the kind of work you contemplate, not only as to an abundance of the right kind of open-shop labor, but also our shipping facilities by both rail and water."

Plaintiff also offered in evidence a letter dated July 2, 1925, which he wrote to Randolph Santini, president of the Arco Vacuum Corporation, an alleged subsidiary of the American Radiator Company, in which he asked whether or not Santini had ever submitted to him the property of defendant known as the "Pusey & Jones" Shipbuilding Company. He said, inter alia, "This is a magnificent proposition comprising a total of about 180 acres together with several modern buildings and an excellent frontage on deep water Delaware River."

On the following day he wrote another letter to Mr. Santini in which he referred to two other properties that might be available to the company. He added: "Should you likewise desire to inspect the magnificent property known as the 'Pusey & Jones Company' at Gloucester, New Jersey, before I return home, communicate with the principal owner, Mr. Henry K. Fort, Philadelphia."

Defendant's testimony as to the telephone conversation was that plaintiff said to him, referring to the Pusey & Jones property: "What commission will you pay me if I sell a big slice out of it?" Defendant answered: "Two and a half per cent." Defendant said that plaintiff replied: "Sometimes I get five, but this will be a big sale and two and a half per cent will be all right. Now get a pencil and take down this name." Defendant testified that he then said: "Hold on, Mr. Trainer, you are not going to get a commission for giving me a name," and plaintiff replied, 'I don't want a commission for giving you a name. I am going to make a sale for you.'" The defendant further testified that plaintiff said: "I

don't blame you for being careful. I wouldn't expect a commission unless I make a sale."

These are the two conflicting theories of this case: plaintiff claims that he was to receive a commission if he gave to the defendant the name of the corporation or person who later purchased the property and if he recommended the property to such purchaser; defendant claims that he was to pay a commission only in the event that plaintiff "made a sale." Defendant further said that the plaintiff asked him to write a letter confirming what defendant had said, that he would give him a two and a half per cent commission if he made the sale, and plaintiff asked him to get this letter "off right away." Defendant said that that night he wrote and mailed a letter to plaintiff reading as follows: "As per telephone conversation this morning, I have noted that you have given me the name of the American Radiator Company, New York City, as being interested in the purchase of the old Pusey & Jones plant at Gloucester, New Jersey, and I have agreed that in the event of a sale being negotiated by you or through you, for any part of the premises to the American Radiator Company, you will receive a commission of 2½%." Plaintiff received this letter promptly and did not then or at any time thereafter, until after the consummation of the sale of this plant to the American Radiator Company of New York, indicate to the defendant that there was any disparity between the terms of the alleged oral agreement by telephone and the agreement as interpreted and declared in the above letter.

On June 30, 1925, plaintiff learned that Cross & Brown, New York brokers, were about to enter into negotiations with defendant for the purchase of the Pusey & Jones plant. Thereupon plaintiff communicated with defendant warning him to be careful in dealing with brokers who failed to reveal the identity of their clients, and stating that he was "in very close touch with" the American Radiator Company and the Arco Vacuum Corpora-

tion. On July 2, 1925, defendant replied that he had not been approached by these companies and emphasized the fact that plaintiff would not be entitled to a commission for merely furnishing the name of a prospective customer, but would have to earn that commission by taking such customer to inspect the property or by introducing him or them to the defendant. On the same day plaintiff wrote to defendant saying that he was about to leave town for a month's vacation and that defendant might be visited by C. M. Woolly and Mr. Santini during that month. The former was the chairman of the board of the American Radiator Company. Defendant replied to this by stating: "I cannot recognize any claim for a commission that is based merely on giving me a name of a corporation and the names of some of its personnel. I wrote that I would pay you a commission of 2½% if a sale was made by you or through you, but by you or through you means more than having information that a concern is looking for a place and knowing the names of its officers."

Late in March, 1925, a representative of Cross & Brown began a survey of possible sites for a plant of the radiator company. On May 1, 1925, this representative saw defendant, but did not disclose the identity of his client until July 3d. On this date defendant (Fort) asked the representative if the American Radiator Company "was interested in locating a plant there" (Gloucester). The representative answered that he was still under instructions not to disclose his principal, but that his (Fort's) deductions were probably as good as the representative's.

On June 3d this representative and one of the vice-presidents of the American Radiator Company investigated the defendant's site. On July 9th the principal's name was definitely revealed. On July 21st the contract of purchase was executed.

Plaintiff learned of this sale to the company early in August, 1925, and then demanded a commission. Was

the evidence submitted by the plaintiff when considered in its most favorable light sufficient to entitle him to have the jury pass upon his claim?

The rule is well settled in Pennsylvania that if a case is supported by competent oral testimony, no matter how strong may be the countervailing testimony, it is for the jury. In Lindemann v. Pittsburgh Rys. Co., 251 Pa. 489, 493, 96 A. 1085, this court in a per curiam opinion affirmed the judgment of the court below and cited approvingly this from the opinion of the lower court: "Credibility is the touchstone of testimony in the measure of its weight. The weight of testimony is that which the jury determines after considering the various elements necessarily entering into its make-up. ...... Some testimony may be as good as gold, as genuine as a standard coin, and some, as worthless as a counterfeit. Testimony may bear the stamp of truth or the badge of fraud and perjury. Who is to pass upon its value? The jury alone. The court cannot invade the province of the jury. The court's supervisory control rests in the discretion to grant new trials."

In Grambs v. Lynch et al., 4 Pennypacker 243, this court in an opinion of Mr. Justice PAXSON said: "It is settled law that when a case depends upon oral testimony, such testimony must be submitted to the jury. Authorities are hardly needed for so obvious a proposition."

In Nanty-Glo Boro. v. American Surety Co., 309 Pa. 236, 163 A. 523, this court quoted approvingly from the opinion of Mr. Justice SHARSWOOD in Reel v. Elder, 62 Pa. 308, the following: "However clear and indisputable may be the proof when it depends on oral testimony, it is nevertheless the province of the jury to decide, under instructions from the court, as to the law applicable to the facts, and subject to the salutary power of the court to award a new trial if they should deem the verdict contrary to the weight of the evidence," and then said, "This rule is firmly established."

In the case before us the weight of the testimony as to the precise terms of the contract was apparently with the defendant. If the contract was as plaintiff testified, his natural response to defendant's memorandum of December 22d would have been remonstrance, but even though this memorandum was subsequently reiterated it met only with plaintiff's silence.

Yet while in law silence often has great evidentiary value, it has little or no contractual value. To an adverse statement formally and responsibly made the law expects but does not demand resistence: Wigmore on Evidence, 2d edition, volume 2, section 1071: " 'Qui tacet consentire videtur,' 'silence gives consent,' are ancient maxims......they merely sum up a broad principle, and cannot serve, without decided qualification, as practical and precise rules." Silence cannot serve as a practical and precise rule even in matters of evidence (much less in matters of contract), as Wigmore clearly indicates further in the text of section 1071. He quotes from Chief Justice SHAW in Com. v. Kenney, 12 Metc. 235, 237, to the effect that a person may sometimes be impelled to silence by the belief that his security will be best promoted thereby, and "then no inference of assent can be drawn from that silence."

If in the case before us the plaintiff had promptly protested defendant's memorandum of December 22d, it clearly would have been for the jury to decide whether the oral contract declared upon was in fact made. The plaintiff's failure to reply to the memorandum does not alter the situation except in this respect: Plaintiff's case is less convincing because there was only silence where naturally (if plaintiff's version of the contract is true) we would expect a protest; but we are not concerned here with the question whether plaintiff's case was less or more convincing. Our only concern is: did he make out a case for the jury? The proposition that plaintiff's failure to reply to defendant's memorandum amounted in law to an acceptance of it (as the court below held)

must be rejected. The significance of silence is for the triers of the facts.

Williston on Contracts, volume 1, section 91, page 168, lays down this principle: "Generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer." (See also 13 C. J. 276, section 74.)

This court in Royal Ins. Co. v. Beatty, 119 Pa. 6, 9, 12 A. 607, said in an opinion by Mr. Justice GREEN: "The contract alleged to exist was not founded upon any writing, nor upon any words, nor upon any act done by the defendant. It was founded alone upon silence. While it must be conceded that circumstances may exist which will impose a contractual obligation by mere silence, yet it must be admitted that such circumstances are exceptional in their character and of extremely rare occurrence. We have not been furnished with a perfect instance of the kind by the counsel on either side of the present case."

It is easy to conceive a situation where after two parties had entered into an oral contract and one party had complied partially with his promise (as plaintiff did here in naming the American Radiator Co. as a prospective purchaser) or had complied wholly with it, the other party in order to be relieved from his reciprocal obligation might write a letter making it appear that the contract was different from the one actually entered into. In such a situation the first party if duly watchful of his own interests would immediately call the other party's attention to the attempted departure from the terms of the contract, but he would not be under any legal obligation to do so. His lack of vigilance would have no effect other than to weaken the force of his own version of the contract when the issue came to trial. From whatever obligation the defendant entered into with the plaintiff in the telephone conversation, he could not be relieved by the writing of any letter attempting to vary the terms of the contract except by a written mem-

orandum affirmatively assented to by the other party thereto.

The first question, which was whether the oral contract was as stated by the plaintiff, was clearly for the jury.

The next question was this: If the jury should find that the contract was as so stated and that plaintiff performed the first part of it by naming to the defendant the prospective purchaser (which was conceded), did he perform its second part, which was to recommend the property to the purchaser? If there was no sufficient evidence that he did, there would be in law a failure of consideration and the defendant would be entitled to binding instructions. The prospective purchaser was a corporation, and therefore recommendation to it would be that made to its officer or agent duly authorized to receive such recommendation. The recommendation that plaintiff claims he made was to the secretary to the vice-president of the corporation. Such recommendation would not be a compliance with the alleged contract unless it could be shown that Merryman had the authority to receive such recommendation or that he transmitted it to someone who had that authority. Merryman's only authority was to investigate in the summer of 1924 properties along the Atlantic seaboard as possible sites for a plant of the company and to report thereon to his superiors. In August, 1924, he visited plaintiff in Chester and obtained from him data concerning certain plants in that city. He then compiled a report thereon and early in December, 1924, but before the report was submitted to his superiors, he accompanied vice-president Swanson, whose secretary he was, on a tour of inspection of the properties mentioned in the report. The Pusey & Jones property was not one of those so mentioned. On this trip vice-president Swanson met plaintiff and inspected the Chester properties. No inspection was made of the Pusey & Jones plant and no reference was made thereto.

Late in December, 1924, and before Merryman had submitted his completed report, plaintiff for the first time called Merryman's attention to the Pusey & Jones plant. Thereafter plaintiff wrote Merryman a letter in which he referred to this plant but declared that "beyond a doubt Chester will be found to be the best place on the Atlantic seaboard for the kind of work you contemplate."

On January 3, 1925, Merryman advised plaintiff that the matter of establishing a new plant had been temporarily abandoned and in March, 1925, wrote him that the matter had not been reopened. Plaintiff then wrote him saying that when the matter was again taken under advisement, he hoped that Merryman would "not forget Chester."

In May, 1925, Merryman was transferred to a new post in the Buffalo division of the radiator company and notified plaintiff of the fact, suggesting that he communicate with Mr. Woolly and with Mr. Santini in regard to the proposed purchase of the Pusey & Jones plant.

It is clear to us that any recommendation made by plaintiff to Merryman did not constitute a recommendation to an officer of the corporate purchaser, unless Merryman transmitted this recommendation to his superior officer, and there is no proof that he did. Merryman had no authority to negotiate for the purchase of any property. His assigned task had been completed before plaintiff first recommended the Pusey & Jones site to him, and he did not include this site in his report. He was then transferred to Buffalo and had nothing further to do with the selection of a site "on the Atlantic seaboard" for the American Radiator Company.

Plaintiff testified that he had made a recommendation to Santini, president of the alleged subsidiary company, but this does not constitute a recommendation to the American Radiator Company. These two companies were distinct legal entities, and there is no evidence that

the recommendation made to Santini was transmitted to the purchaser.

As to the recommendations to Mr. Woolly, plaintiff testified that the first time he met Mr. Woolly was when the latter came to Chester in 1924. At that time plaintiff was trying to sell the American Radiator Company a plant in that city. He testified that he met Mr. Woolly at Chester in May, 1925, and that he showed him the Baldwin Locomotive Works at Eddystone on the river front. When plaintiff was asked: "So that from February, 1925, until July, 1925, you had no dealings with anybody connected with the American Radiator Company?" he replied, "I don't recall." He was also asked: "...... Can you show me in your files any letters from any officer of the American Radiator Company looking toward or considering or taking up the question of the purchase of the Pusey & Jones plant or any part of it at any time either prior to December 22, 1924, or after December 22, 1924, up until August 1, 1925?" He answered: "I have been hunting for it. I don't know where it is. I have had two letters."

Plaintiff also admitted in cross-examination that he received no letters of any kind from any person connected with the American Radiator Company from December 22, 1924, until August 1, 1925, looking toward the purchase of the Pusey & Jones plant or any part of it, except from Merryman, who was not an executive officer, and from Santini.

Plaintiff's evidence falls short of amounting to prima facie proof that he recommended the property in question to the corporation that purchased it. Even if what plaintiff wrote to Merryman should be regarded as a "recommendation" to the American Radiator Company, it would appear to be a dubious one. What he said in his letter dated December 30, 1924, about Chester being "the best place," etc., we have already quoted. In his letter of January 3, 1925, he said: "We would of course prefer to have you locate in or nearer to Chester, but if

you should conclude that not any of the propositions submitted here are entirely suitable, then we would advise giving serious consideration to this Gloucester proposition."

The trial judge in his charge to the jury aptly said: "Did he [the plaintiff] follow up the mentioning of the name of the American Radiator Company to Mr. Fort [the defendant] as a possible purchaser by representing the property to the Radiator Company, and urging its purchase upon them? Now, he could do that only in one general way; that is, by communication by letter or word of mouth or telephone or otherwise with the authorized officers and agents of the American Radiator Company. He could not do it by merely correspondence with some clerk in the corporation; he could not do it by communication, either oral or written, with one who had no authority to act in the matter of the purchase of the real estate for the Radiator Company."

Plaintiff failed to furnish prima facie proof that he earned the commission claimed, by complete performance on his part of the contract pleaded. His case in its second phase rested on inferences rising no higher than conjecture.

The judgment is affirmed.