Smail *v.* Penowa Coal Sales Company, Appellant.

Argued November 19, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*J. Leonard Smith, Jr.,* with him *Paul E. Hutchinson* and *Reed, Smith, Shaw & McClay,* for appellant.

*Thomas L. Wentling,* with him *Patterson, Crawford, Arensberg & Dunn,* for appellees.

OPINION BY DITHRICH, J., January 17, 1952:

Plaintiffs are partners trading as the Smail Coal Company and as such are engaged in the strip mining business. They brought this action in assumpsit against the defendant, Penowa Coal Sales Company, to recover $2725.63, with interest, alleged to be due under an oral

contract pursuant to which plaintiffs sold and defendant bought 18 carloads of coal containing 1090 tons at $2.50 per ton.

The record discloses that in June and July of 1947 coal in the quantity alleged was consigned to defendant and delivered to the Pennsylvania Railroad scales at Youngwood. The shipments were resold and reconsigned by defendant to the Central West Coal Company. When the coal arrived at its docks on Lake Erie, a representative of the Central West Coal Company inspected it and discovered that it was of inferior quality. A reduction of $1.50 per ton from the selling price was demanded and granted to the purchaser. In due course defendant received payment in the amount of $1.00 per ton plus a sales commission.

Defendant having admitted in its answer under "New Matter" that it had resold the coal for $1096.26, upon motion by counsel for plaintiffs judgment was entered in favor of the plaintiffs and against the defendant in the aforesaid sum, and the jury found for plaintiffs for the remainder of their claim.

By way of defense against liability for the payment of the balance of plaintiffs' claim, defendant asserted that the oral contract between the parties was not one of outright sale at a fixed price as alleged by plaintiffs, but was, rather, a brokerage agreement whereby it was to sell the coal at the best price obtainable and remit to plaintiffs the price obtained, less a sales commission. Moreover, defendant averred that the shipments made by plaintiffs to defendant were pursuant to an established custom in the coal trade, namely, that orders for the account of others were subject to inspection and rejection by the ultimate consignee at the risk and expense of the shipper. There was evidence to support the defense offered, including uncontradicted testimony that, when the Central West Coal Company refused to accept the coal unless an allowance was

made, one of the plaintiffs, Richard Smail, directed defendant to sell the coal at the best possible price to avoid the expense of reconsignment. Hence, it was defendant's position that $1096.26, the resale price less the sales commission, was all that was due plaintiffs under the contract.

The case was tried before a jury which returned a verdict for plaintiffs in the amount of $2083.74. The court en banc refused to grant a new trial or enter judgment n.o.v. Defendant's appeal from the entry of judgment on the verdict raises three questions: (1) Is the verdict against the evidence and the weight of the evidence? (2) Is the verdict contrary to law? (3) Should defendant be granted a new trial for the purpose of producing after-discovered evidence?

Victor Smail, one of the plaintiffs, testified to the following. In 1947 plaintiffs uncovered a vein of substandard coal in Fayette County. Subsequently, William N. Stone and a Mr. Kumer,[1] sales agents of the defendant Company, inspected the coal while it was still in the cut and recognized that the coal was substandard. The question was whether a price could be obtained which would warrant mining and loading it. On direct examination Smail testified: "I wanted to know what the price would be to us. They asked me what I wanted for it. I said it would take at least two-and-a-half to load that coal. . . . Mr. Kumer said, 'We can always get two-and-a-half. We have a place we can dump it any time. We are sure you will get two dollars and a half. We'll load some to see what happens.' " On cross-examination he stated: "There was a difference in the price there between us, and I said, 'We'll load some if we don't get less than two-and-a-half. We

---

[1] Mr. Kumer is no longer associated with defendant and his whereabouts at the time of the trial was unknown and is still unknown.

can't load for less than two-and-a-half.' He said, 'I can always get you two-and-a-half. We have a place where we can put it any time and get at least two-and-a-half for it.' " The coal was loaded and shipped in accordance with defendant's instructions and plaintiffs had nothing further to do with it after it reached the scales at Youngwood. According to Smail, he did not know at what price the coal was resold. He said that plaintiffs were "to get a price and that's all we knew." He also testified that the amount paid plaintiffs never depended on where the coal was ultimately shipped for consumption and that "We sold the way we always sold; we had a price for that coal, and that is the way we always figured it . . ."

Stone, the aforementioned sales agent, was employed by defendant from 1944 to 1947 but had left its employ before the contract in question was entered into. Subpoenaed by plaintiffs, he testified that while employed by defendant he purchased coal for its account from the plaintiffs and others; that it was usually purchased f.o.b. mine; that after the purchase producers had no control over the coal; that defendant fixed the price to the ultimate consignee which it named; that defendant was entitled to any difference in price between that paid to the producer and that received from the ultimate consignee. However, while he and Kumer together looked at the particular coal in question, he knew none of the details of the oral contract under which it was sold. Kumer negotiated the contract for defendant.

Defendant's witness, William M. Thomas, office manager of defendant Company from 1943 to 1950, admitted on cross-examination that defendant did at times purchase coal outright; that plaintiffs were always paid a certain price for coal purchased from them; that when defendant resold coal at a higher

price than that at which purchased from plaintiffs they received no part of the increase.

The terms of a disputed oral contract and the understanding of the parties as expressed by those terms are matters of fact and therefore for jury determination. *McCormack v. Jermyn,* 351 Pa. 161, 164, 40 A. 2d 477. Also, it is settled law in Pennsylvania that a case supported by competent oral testimony, no matter how strong may be the countervailing testimony, is for the jury. *Trainer v. Fort,* 310 Pa. 570, 577, 165 A. 232. And where a defense depends upon the testimony of defendant's witnesses, though such testimony is uncontradicted, the case must be submitted to the jury, subject to the trial court's discretionary power to award a new trial. *Hatfield v. Sovereign Camp of the Woodmen of the World,* 129 Pa. Superior Ct. 570, 574, 196 A. 904. Viewed in its entirety and in the light most favorable to plaintiffs (*Rader v. Palletz,* 160 Pa. Superior Ct. 335, 337, 51 A. 2d 344), we are of opinion that the evidence was sufficient to support the verdict, which was neither against the evidence, the weight of the evidence, nor contrary to law.

With respect to the after-discovered evidence the court below said: "This so-called after-discovered evidence is an alleged written sales agency agreement between the plaintiffs and the defendant company, dated April 12th, 1946. Its provisions cover the marketing of coal agreeable to the Bituminous Coal Act of 1937 then in effect. The agreement did not allocate to the defendant all of the coal produced by the plaintiffs, and it dealt solely with a strip mine located in Westmoreland County and not at the place where the coal involved in this suit had been shipped from in the summer of 1947. . . . we do not believe that it would have likely resulted in a verdict in favor of the defendant. The agreement was always in the possession of the defendant company, and it had from the time when this suit

was brought, viz., October 22nd, 1948, until the date of trial, January 15th, 1951, to locate it. [It had been misfiled.] In the circumstances this reason for a new trial must also be denied. [Citing cases.]"

Judgment affirmed.