Wilson et al. *v.* McKee and McDanel, Appellants.

Argued April 21, 1933.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Thompson Bradshaw* of *May & Bradshaw,* for appellant.

*Myron E. Rowley* of *Craig & Rowley,* for appellee.

OPINION BY KELLER, J., October 2, 1933:

This was an action in assumpsit by a duly licensed broker to recover commissions alleged to have been earned in producing a buyer for real estate, who was ready and willing to purchase, but with whom the owner refused to deal.

The appellants, who were partners, owned, as such, jointly, a piece of real estate in Ambridge, known as the Post Office Building. They contemplated dissolving the partnership and requested A. W. Wilson, of the firm of Wilson & Davis,—the use plaintiff, to whom we shall hereafter refer as the plaintiff,—to secure a purchaser for this building for the price of $65,000, and agreed to pay him "the usual and ordinary commission"—which plaintiff testified was three per cent —for obtaining such purchaser. Plaintiff interested two men jointly, Andrew Karnavas and Dr. Zacharias Spanos, who signed an agreement prepared by him, without consultation with or authority from the owners, by the terms of which they agreed to buy the Post Office Building for $65,000, payable as follows: $1,500 on signing the agreement; $13,500 on or before 90 days; the balance whenever mortgages for that amount could be secured. By the terms of this agreement the *owners* were to guarantee to secure for the purchasers first and second mortgages aggregating $50,000. The agreement also provided that the purchasers should not be called on to give any mortgage which required them to carry life insurance.

As the original employment of the plaintiff, as

broker, mentioned $65,000, without more, as the selling price of the property, cash would be contemplated as the consideration, and the procuring of a purchaser on the terms set forth in the agreement just recited—which we shall call agreement No. 1—would not, unless accepted by the owners, entitle plaintiff to his commission. This agreement was never accepted by them. It was not satisfactory to McKee, who so notified plaintiff, and himself prepared an agreement, which was acceptable to both him and McDanel, under the terms of which the consideration of $65,000 should be payable as follows: $1,500 on signing agreement; $13,500 on or before the expiration of 30 days; the balance, $50,000, on or before the expiration of 60 days; the owners agreeing to accept as part payment a second mortgage in a sum not to exceed $15,000 for a term of three years, payable in six equal semi-annual instalments. It contained no guaranty or agreement whatever by the owners to secure any other mortgage for the purchasers, as McKee specially objected to that feature of the first agreement. This agreement, hereinafter referred to as agreement No. 2, was prepared by McKee on October 5, 1926, signed by him and McDanel and then delivered to the plaintiff to secure the signatures of Karnavas and Spanos. It was kept by plaintiff for nearly two weeks, and then on October 18, 1926 was returned by him to McKee at the latter's request. He had not been able, in the meantime, to induce Karnavas and Spanos to sign it. The plaintiff testified that McKee asked him to return it as he did not want it out of his possession, but that when the other parties were ready to sign he could bring them to his office, where they could sign it. McKee testified that he told plaintiff to return the agreement, if not already signed; that he and McDanel had adjusted their differences and the property was no longer for sale. Of course, if the conversation had been as McKee testified, there could be no recovery by plaintiff, for the

owners could revoke the authority to secure a purchaser on their terms, and decide not to sell, at any time before a purchaser was obtained. The property never was sold. But the jury found against the defendants on that point, and on that, as well as all other disputed matters of fact, we shall have to accept the version of the plaintiff.

On November 1, 1926 the plaintiff, accompanied by Karnavas and Spanos, called at McKee's office and told him he had brought them to sign the agreement. McKee said he had no property for sale and refused to deal further in the matter. Nearly three years later this action was begun.

At the trial it was developed that neither Karnavas nor Spanos, who were Greeks, had ever read agreement No. 2; that they relied, as to its terms, on what the plaintiff, and McDanel, whom they met in the plaintiff's presence, had told them about its terms. Spanos testified that he was ready and willing to sign agreement No. 2, and understood that he and his co-purchaser were themselves to secure a $35,000 first mortgage as part of the terms of purchase. This testimony differed from his evidence at the first trial of the case, fifteen months before, when he swore that he was willing to sign the second agreement if it was written the way he thought it was written, and the way the plaintiff and Karnavas had explained it to him, viz., that there was a $35,000 first mortgage on the property which he and Karnavas could assume. His explanation of this evidence, which was repeated several times at the first trial, was that he misunderstood; that he was, in fact, ready and willing to sign the second agreement, as it stood, on November 1, 1926. We think this evidence, while contradictory, was for the jury. As a matter of fact, there had been a $35,000 mortgage placed on the property by McKee and McDanel several years before, which contained the life insurance provision objected to by Karnavas and

Spanos in agreement No. 1, viz., that life insurance should be issued on the mortgagor's life in the amount of the mortgage and in the event of his death the mortgage should be paid by the insurance. This mortgage had been reduced by payments to $18,000 which was its amount when negotiations as aforesaid were begun.

But Karnavas, called as a witness by the plaintiff, testified on this trial, as he had done on the first trial, that he was ready and willing to sign agreement No. 2, on the understanding, as explained to him by the plaintiff and McDanel, that there was already a $35,000 mortgage on the property which he and Spanos could assume and take over; in other words that the owners, would provide both mortgages, aggregating $50,000, and that the only difference between the first and second agreements was that under the latter, the second mortgage of $15,000 would have to be paid in three years in semi-annual instalments, which was not so provided under the first agreement. The plaintiff himself admitted that he had told Karnavas and Spanos when he first discussed the proposition with them "that there was a $35,000 mortgage already on the property and that they could assume that." This he explained by saying that McDanel had said several times "that there was a $35,000 mortgage on the building, a payment mortgage, and no doubt the buyers could get the same mortgage for them as it was before." We think it is clearly established by the evidence that Karnavas was only willing to sign the second agreement on the basis that the plaintiff and McDanel had represented to him that there was a $35,000 first mortgage on the building, which the purchasers could assume and that he and Spanos would need to raise only $15,000 cash and provide for the payment of the second mortgage in three years; his evidence reasonably admits of no other construction; and the court below recognized this when in its charge

to the jury it said: "He [Karnavas] said [on the first trial] they could not buy unless McKee and McDanel secured the two mortgages for them, that is, took a second mortgage of $15,000, and secured for them a first mortgage of $35,000. He said they were relying upon McDanel and McKee to do this. He further testified that that is still, at the time of trial, his understanding of this agreement of October 5th [agreement No. 2]. He said that his understanding was that the only change in the second agreement from the first was as to the provision in the second that the second mortgage of $15,000 should be paid in three years, in three annual payments of $5,000 each. The understanding, as thus testified to by Mr. Karnavas as being in his mind on November 1st is not in accordance with the terms of the written agreement of October 5th, with reference to the taking care of the $35,000 of the purchase money." The effect of such an understanding would be to make the owners guarantee the financing of the mortgages, which was what McKee had specifically refused to agree to.

It must be remembered that there were two parties on each side of the proposed transaction; that the agreement, to be binding and earn for the plaintiff his commission, must be satisfactory and accepted, in every particular, by Karnavas as well as Spanos; that neither could bind the other by his individual acceptance. Both had to be satisfied. And while McKee and McDanel were partners, and held this real estate as partnership property, the law in this Commonwealth as to real estate so held is that, "As regards the power of disposition, land held as partnership stock is not subject to the rule that makes each partner the agent of the firm. Neither can sell more than his own undivided interest, unless he have from the other a sufficient special authority for the purpose": Foster's App., 74 Pa. 391, 397 (SHARSWOOD, J.). Followed or cited with approval in Account of C. H. Welles, 191

Pa. 239, 248, (Mitchell, J.), 43 Atl. 207; Shupe v. Rainey, 255 Pa. 432, 438, 100 Atl. 138.

Hence any unauthorized representation by McDanel to the intending purchaser, as to the assumption of the first mortgage, or its financing by the owners, would not bind McKee, and any statements to the purchasers made by the plaintiff, in reliance on them, would not bind McKee or become part of the contract to be entered into between the parties, unless agreed to by McKee. And any contract entered into by the purchasers on the strength of such unauthorized representations would not earn for the plaintiff his commission, unless McKee had agreed to them before the contract was executed, and there is no evidence that he had done so. It is all the other way. The plaintiff would not earn his commission by inducing the purchasers to sign a contract, unread, upon representations as to its terms, which it did not contain and which his principals—or either of them—had not authorized him to make. The only outcome of such a transaction would be, not a completed sale of the property, but a refusal by the purchasers to carry out the agreement, because of the representations of the owners' agent by which they had been misled and induced to sign the agreement. The plaintiff's commissions could be earned by him only by his strict compliance with the conditions of sale put in writing by his principal, without change or modification: Trainer v. Fort, 310 Pa. 570, 583, 165 Atl. 232. It would not be earned by merely producing a customer who expressed his readiness to sign the agreement of purchase, where such customer admitted that his readiness to sign was induced by representations of the agent at variance with the written contract.

We think the evidence establishes that as to Karnavas, his willingness and readiness to sign the second agreement were based on statements and representations which emanated from the plaintiff, or from Mc-

Danel, made in his presence, and which were not in consonance with the agreement prepared by McKee; statements or representations the latter had never authorized and was unwilling to adopt; that the plaintiff never produced a purchaser who was willing to buy the building on the terms set out in agreement No. 2, except as modified or qualified by those statements and representations; and that in consequence he did not earn the commission contracted for in case he secured a purchaser on those terms.

We give no weight to the testimony of the plaintiff as respects McKee's agreeing to pay him a commission sometime after the fruitless meeting on November 1, 1926. While this was denied by McKee, we accept the plaintiff's version, as we are required to do, but the final substance of his testimony was not that McKee agreed to pay him the commission agreed upon, but that he said: "You are entitled to *a* commission. Wait until I get through with this trouble with McDanel and I will take care of it." The effect of his testimony was an admission by McKee that he owed the plaintiff *something,* and the court properly so interpreted his evidence. (Record, p. 65-a.)

The plaintiff, in his statement of claim, declared on a contract for a specified compensation, to wit, "the usual and ordinary commission" for obtaining a purchaser, not on a quantum meruit. If the plaintiff's testimony be viewed as supporting a claim on a quantum meruit for the value of his services to the defendants, in place of the agreement for a definite commission, it could not be sustained without an amendment of the statement and an entire change of the theory of the case. On the other hand, if it be considered as supporting a claim that the defendant, McKee, after the final meeting on November 1, 1926, voluntarily promised to pay the plaintiff the commission which he was to receive in the event of full performance in securing a purchaser on the defendant's

terms, although he had not performed by securing a purchaser, it would require, in order to sustain it, a different amendment of the statement and change of theory, and besides would be a mere naked promise, without consideration.

The assignment of error is sustained. The judgment is reversed and is now entered in favor of the defendants non obstante veredicto.

Judge JAMES dissents.