## WASATCH CONST. CO. v. UTAH CONST. CO.

No. 5899.   Decided August 17, 1938.   (82 P. 2d 101.)

*Jesse R. S. Budge*, of Salt Lake City, and *Christenson, Straw & Christenson*, of Provo, for appellant.

*Bowen & Quinney*, of Salt Lake City, for respondent.

MOFFAT, Justice.

Accepting as nearly as we can the help of counsel where analysis and interpretation are helpful, we still discover that a statement of the case results in a composite of pleadings, evidentiary matters, and contentions as to the law, developed as the trial proceeded. Out of these, the trial court and counsel have sifted the testimony and analyzed the actions of the parties in an attempt to ascertain the terms of an oral

contract that seemed to be added to or taken from and construed by the parties, sometimes differently, sometimes agreeably, as operations proceeded. Any attempted statement of facts or issues, or what the contract was, is of necessity a resulting composite. The issues are much like "Topsy," they "just grew." Such is not infrequently the result in differences arising out of executory oral contracts concerning such operations as are here involved. It is, therefore, not easy to make an adequate statement of the case without the involvement of data antedating the contract and matters said and done following the making of the oral arrangement. This results in fishing out of events what the parties were really attempting to do.

In April, 1930, highway building presented an opportunity for those equipped to engage in construction work. W. O. Creer was general manager of the Wasatch Construction Company, the plaintiff and appellant; W. H. Wattis (now deceased) was general manager of the Utah Construction Company. Both companies are Utah corporations. The managers were old acquaintances. They were both experienced in construction work. Mr. Creer called upon Mr. Wattis at the Ogden office of the latter and proposed that the two companies undertake jointly such jobs as they might be able to secure. An agreement was made—sufficient, at least, that they proceeded. The terms of the agreement are in dispute. The jobs handled pursuant to the understanding, and the extent thereof, form part of the differences.

Appellant contends that the parties agreed: That all bids were to be submitted in the name of the Utah Construction Company, which company was to furnish the necessary bond required by the highway authorities (this was done, and there is no dispute as to that); that the work should be carried on on a 60-40 basis that is to say, each party should furnish equipment according to its ability and convenience, on the basis of 60 per cent by respondent and 40 per cent by the appellant. The differences between the parties as to this item arise from analyses and arguments which have

led them to different conclusions. The parties seem to be agreed that there was a contract, or at least a basic understanding, entered into in April, 1930, for a joint undertaking relating to road contracts; that operations were to be financed by the Utah Construction Company; that bids were to be submitted and contracts taken in its name; that W. O. Creer was to act as superintendent at a salary of $300 per month; that each party was to contribute equipment for use on the jobs; that the profits and losses were to be shared by the parties. Each project was an open question. Details were left to be developed as contracts and operations proceeded. Nothing is said about how many or what contracts were to be included, or how long the arrangement was to continue, nor the extent, character or amount or details of purchasing equipment, or methods of financing. Details provoked differences. Much is said by counsel about the "weighted value theory" as distinguished from the "rental value theory." As nearly as we are able to determine, neither "weighted value" nor "rental value," as used by counsel for either party, was a part of the contract or contracts, but the so-called "weighted value theory" and "rental value theory" are developments by counsel or the parties in attempts to arrive at a profit-sharing basis.

Appellant has assigned errors and respondent has assigned cross-errors. The complaint is in two causes of action. The first relates to the Utah-Idaho jobs and the Nevada contracts; the second relates to the Arizona jobs. Appellant has condensed its assignments of error, as they relate to the issues, findings and judgment of the court upon the first cause of action, to four questions for determination. They are: (1) What was the contract entered into in April, 1930? (2) What projects were joint operations? (3) What property, if any, was purchased as joint equipment? (4) What, if anything, was appellant entitled to recover? As to these four questions, appellant states its position to be:

"(1) That as to contracts jointly performed, equipment was furnished by each party *according to its ability and convenience* on the

basis of 60% by respondent and 40% by appellant, *taking into consideration the rental value* of the equipment and *the time of use thereof*; any difference to be adjusted at the conclusion of the operations, upon a *debit* and *credit* basis.

"(2) New equipment purchased for us on the work was to be jointly owned on the 60-40 basis.

"(3) Profits or losses were to be shared on a 60-40 basis.

"(4) All Utah-Idaho contracts and those at Austin and Wells in the state of Nevada were joint operations under the contract of April, 1930."

## Respondent counter-states the questions as follows:

"(1) Was the 60-40% ratio in which Defendant and Plaintiff were, respectively, to furnish equipment adopted for the purpose of fixing the right of each party in the matter of furnishing equipment, with profits to be shared in the same ratio that the equipment furnished by each bore to the whole even if the 60-40 ratio were not maintained, as claimed by Defendant?

or

"Was this ratio adopted for the purpose of fixing a point at which rental would begin to run in favor of the one exceeding its quota, and for the purpose of fixing inflexibly the percentage of the profits to which each party would be entitled without any regard to the relative percentages of equipment furnished, as claimed by Plaintiff?

"(2) Was the time value of equipment furnished to be computed by multiplying the time of use by the unit of *actual value*, as claimed by Defendant?

or

"Was the time value to be computed by multiplying the time of use by the unit *rental value*, as claimed by Plaintiff?

"(3) Was new equipment, purchased during the progress of the work, and paid for wholly with Defendant's funds, and necessary to bring Defendant's percentage of equipment to approximately the 60 per cent ratio agreed upon, its own property, as Defendant claims?

or

"Was a 40 per cent interest therein immediately vested in Plaintiff, and Defendant required to carry the investment until earnings of the enterprise liquidated it, or in default of that be relegated to a claim against Plaintiff for its 40% interest, as claimed by Plaintiff?

"(4) If the latter, then was the income from the enterprise to be charged with the cost of such new equipment for the purpose of determining profits, as claimed by Plaintiff?

or

"Were such costs to be ignored in determining profits, as claimed by Defendant?

"(5) Was the time value of such new equipment, (assuming the adoption of Plaintiff's theory of computing profits), to be ignored, (whether rental or actual) in determining the respective percentages of the whole contributed by the parties, as Plaintiff claims?

or

"Was the time value of this new equipment (again assuming adoption of Plaintiff's theory of computing profits), to be included with the other equipment in determining the time value of the whole and each party given credit for the amount of its interest therein for the purpose of determining the percentage of the whole contributed by them, respectively, as Defendant claims?"

As to the first question—"What was the contract entered into in April, 1930?"—it has been largely answered in the statement of the case. A reading of the record, the findings and judgment of the court, and counsel's analysis of the whole situation, forces us to believe that if there were a contract entered into at all in April, 1930, no one knows definitely what it is; or if we may speculate as to what it is, the agreement is to be pieced out of events and placed together by a consideration of what was done and said at different times, and as operations proceeded, up to the day of attempted final settlement, or the resulting dispute. If left entirely to what the record shows was said by Mr. Wattis and Mr. Creer on behalf of their respective companies when the preliminary arrangements were discussed, it may be doubted there was any enforceable contract at all. That bids were to be submitted and, if successful, the contracts taken in the name of the defendant comany, is testified to and subsequent events and operations established it as a fact. That Mr. Wattis and Mr. Creer discussed some matters as to the ratio of equipment to be furnished is also established. It is further clear that there was something said about the furnishing of equipment upon the ratio of 40 per cent by plaintiff and 60 per cent by defendant, which developed to be impracticable or impossible in an accurate mathematical sense.

From this point, operations, in the broad sense of the term, are the primary factors in determining what the relationship of the parties really was.

At no time, unless it should be a mere coincident, would it normally be expected, where machinery of large and varied unit values and of diverse types are involved, and the time of use variable, that the exact 60-40 ratio would obtain. Nor is there anything from which it may be determined in advance the length of time any assembly of equipment or any unit thereof might be used. Both Mr. Creer, of the Wasatch Construction Company, and Mr. Corey of the Utah Construction Company, gave different and detailed accounts of what the alleged contract was thought, by each of them respectively, to be. The testimony of both of them was given in the light of subsequent developments and after the joint operations had developed situations and conditions that in all probability produced impressions resulting as much from what was subsequently said and done as from the terms of the first tentative understanding. The court had the task of ascertaining or constructing an understanding out of subsequent events as much as out of the original understanding from which the operations developed, proceeded and matured. So that while it may be said there was initiated an understanding sufficiently broad and definite in some of its terms to justify proceeding in pursuance of that first understanding of April, 1930, it was modified by subseqeunt operations to fit and meet the exigencies imposed by circumstances over which the parties in some instances had control; over others, they met the inexorable as best they could.

The foregoing discussion is illustrated in the second question submitted. Who owned the newly purchased equipment? By which company was it owned? Was it owned jointly? If so, in what proportions? After having checked all the evidence in the record and the stipulations of the parties, we believe the court's findings are supported by the evidence. These questions are answered by the court's find-

ings. We quote the findings thereon in preference to a restatement of the matters found in the record:

"9. During the performance of the joint contracts the following equipment was purchased jointly under and pursuant to the terms of the oral agreement herein referred to, for the prices set opposite the name of each item; and it was agreed between said parties that at the conclusion of the Utah-Idaho jobs the salvage value of said equipment was as set out in the column marked 'salvage value' beside the name of each item of equipment." (Then follows a list of equipment.)

"10. That the purchase price of the Cedar Rapids plant, the concrete mixer, the 100 horse power motor, the Primary crusher, the one-half ton truck and the Universal crusher were not charged to any individual project, nor was any charge made against plaintiff for its forty per-cent of that purchase price.

"11. That upon the Russel Gravel Plant and Waueksha motor the plaintiff paid the sum of $400.00, and the balance of the purchase price of said machines was paid by defendant; and the defendant also paid the plaintiff $240.00 on account thereof, leaving a net amount paid by plaintiff on said machines of $160.00.

"12. That the Adams grader and the McCormick unit were not purchased as joint equipment, but were purchased by defendant for itself.

"13. That the parties stipulated and agreed to the following credits: To plaintiff, $35.00 for rental of ripper, and $75.00 for rental of Roadblade; to defendant, $7375.79 for repairs to plaintiff's equipment and $345.36 for joint tools purchased pursuant to stipulation filed February 7, 1936.

"14. That plaintiff has been paid in cash on account of said joint enterprises, the sum of $4500.00."

As to what projects were joint ventures, the court found in pursuance of a stipulation that the jobs referred so as the "Utah-Idaho jobs" were joint, and that the Nevada jobs were joint. As to the Nevada jobs, known as the "Austin Highway Project," and the "Wells" contract, the court found that these contracts, as the others were taken in the name of the Utah Construction Company in pursuance of the joint understanding. Respondent assigns cross-error and maintains that the finding of the court to the effect that the Nevada projects were joint ventures is not supported by the

evidence. There is a conflict in the evidence. It appears that Mr. Creer participated in matters pertaining to the securing of data and making estimates relating to the bids. It also appears he was consulted about and agreed to the subletting of the contracts to Hunt and Heiselt Construction Company. There was a question as to whether the whole job should be sublet or only part of it. As to the division of the profits out of these projects, the evidence supports the findings and conclusions reached by the court. The principal item in controversy is the making of an allowance to the subcontractor because of the loss he sustained and the payment to the subcontractor of a sum in order to effect the completion of the job. Had that sum been paid out of joint funds its allowance could not have been questioned, and had plaintiff paid the sum, we see no reason why he should not have been reimbursed—likewise as to the defendant.

There is an argument, interesting but scholastic, as to the matters which appellant is pleased to call "rental value" of the equipment, and what respondent denominates "weighted value." We are unable to recognize any substantial difference when reduced to practical application. When there is an agreement as to value, (cost, reasonable, market, or inventory), and a calculation of use arises, the factors for determining the use value is the agreed value, "cost, market or inventory," and the time of use is determined, the "rental value" or "weighted value" is the same in the end. In other words, the thing to be determined is the amount of rent to be paid for the use. Algebraically stated, where V equals Cost, Market or Inventory Value, and T equals the Time used, the rent is V times T equals R. Other factors may be injected for the purpose of arriving at the value, such as wear and tear or depreciation rates, upkeep, cost of operation, efficiency, duration or life length, etc., but in the last analysis the amount of rent is the ultimate matter to be determined. What factors go into the calculations, for the determination of value or the methods to be used or ends to be attained, may be more or less numerous

and variable, but, once determined, rent is usually that value as one factor and time of use or occupation the other. It becomes at once apparent that any disturbance of the trial court's final figures creates a confusion as to the selective factors entering into the formula and would create a situation in the instant case about which the parties might litigate with uncertainty and interminably.

A more difficult problem is presented upon plaintiff's second cause of action, relating to what are referred to as the Oak Creek and the Pine Winslow jobs. Appellant contends for recovery of the rental value of the equipment of appellant used in the Arizona jobs, and 40 per cent of the rental value of certain joint equipment, claimed to have been purchased jointly for use on the Utah-Idaho jobs, which was also used in the projects in Arizona. Respondent contends, as we understand its position, that as to the Arizona projects, they were within the terms of the April, 1930, contract in so far as that contract provided for certain matters, viz.: The joint performance of such road contracts as should subsequently be agreed upon; that the operations under such contracts were to be financed by the Utah Construction Company; that the bids were to be submitted in the name of the Utah Construction Company; that W. O. Creer was to be superintendent of the construction work upon those jobs for $300 per month; and each party was to contribute equipment on some basis, 60 per cent and 40 per cent or according to ability and convenience or value, and time of employment.

From what appears in the record, this agreement or understanding of April, 1930, is what may be termed an agreement to make subsequent agreements if and when terms and conditions presented agreeable opportunities. A sort of general contract under which other contracts were to be made. As we read the record, each project was a separate undertaking which either party could have accepted or rejected as a joint venture.

The court found that in addition to the Utah-Idaho and Nevada jobs "the parties agreed to perform jointly on *like terms* two contracts in the state of Arizona." (Italics added.) The court further found the work incident to the construction of the Oak Creek and Pine Winslow jobs and the transactions of the business relating thereto was done by plaintiff while a foreign corporation to the state of Arizona (plaintiff not having qualified to do business there as a foreign corporation). As a conclusion of law, the court decided that the contracts entered into in Arizona were null and void, being in violation of the laws of the state of Arizona.

The difference between the parties is: Plaintiff maintains that the Arizona jobs were constructed by plaintiff upon a rental basis as to its machinery; while defendant claims that they were undertaken as a joint venture, controlled in its general provisions by the April, 1930, understanding, but as to the contract for construction and the details thereof, those jobs were separate contracts. Both parties agree the contract was entered into in Flagstaff, Arizona. In response to a question by the court, when the court asked whether there was any controversy as to where the Arizona agreement was made, the answer indicated that it was made in Flagstaff, Arizona. In plaintiff's complaint, first filed in Arizona, and admitted in proof, it was so alleged. The oral discussions between Mr. Creer and Mr. Corey would also justify such a finding.

Appellant argues, or at least submits a number of authorities supporting the doctrine that an isolated act of business done, or a contract entered into by a corporation foreign to the state where the isolated contract or single transaction of business occurs, does not come within the law requiring a foreign corporation, before doing business as such in a foreign state, to comply with the laws of such state whereby it qualifies to do such business. The cases cited support the doctrine contended for, but the evidence discloses that the Arizona contracts contemplated, and were,

operations of considerable magnitude for constructing two separate highway projects in the state of Arizona. Both parties to the transactions moved considerable equipment to the state, maintained road camps and conducted operations involving the expenditure of considerable sums of money. An appropriate statement is found in one of the cases cited by both parties. It is an Arizona case wherein many cases are discussed and applied. The court, in a case similar to the instant case, said:

"We have been unable to find a single case where acts going to the extent of those performed by plaintiff in this state have been held not to amount to the doing of business and in the vast majority of cases which fall within such statutes * * * had done far less than did plaintiff in this case." *National Union Indemnity Co.* v. *Bruce Bros., Inc.*, 44 Ariz. 454, 38 P. 2d 648, 652.

Some matters of detail are argued relating to what was covered by the agreement of April 1930. Some as to operations and other details such as "rental values" or "weighted values," the specific projects covered, net profits, joint equipment, specific items of equipment, salvage values and disputed debit and credit items. Except as further noticed, we have disposed of those items in the discussion heretofore made. As supporting the construction, that the alleged agreement of April, 1930, was an agreement contemplating future agreements, a basic understanding from which to proceed in making construction contracts, these may be noted. Plaintiff was not required to participate in any of the contracts taken by defendant. Plaintiff participated, or had the option to participate, in part of the construction covered by the principal contract taken in the name of the Utah Construction Company, such as doing the grading, or furnishing the gravel, or doing the surfacing, or handling, more or less completely, the whole project, or doing none of the construction work, yet participating in subletting—as in the Nevada jobs. Nothing is said about net or gross profits. It took an interpretation of operations over three or four years in addition to the oral discussions and under-

standings to reach a basis upon which profits should be divided. The court realized this, and in the light of the whole situation, it determined what equipment was separately owned or used and what was jointly owned or used, but neither party agrees fully with what the court found, nor with the basis of values nor the rental values.

As to the question of costs, the trial court decided that each party should pay its own costs. Appellant thinks the trial court abused its discretion in so deciding. There are reasons why plaintiff should have been allowed its costs to follow the judgment. Most of the elements of the cause pertain to legal questions the ultimate of which is the recovery of damages arising out of an alleged conversion. On the other hand, the court was confronted with the matter of unravelling a series of transactions and operations intertwined with oral understandings and operative interpretations, and with matters of accounting which both parties seem to have regarded as sufficient to justify treating the proceeding as one in equity. It was so treated, and whether the cause was one in equity or not, is not before us. It may be added that the plaintiff failed upon part of its theory upon the first, and entirely upon its rental theory upon the second cause of action. We cannot say the trial court abused its discretion in the matter of costs, and, while the judgment must be affirmed, because of the nature of the case, we are disposed to follow the trial court's precedent and hold that each party bear its own costs on this appeal. Such is the order.

Judgment affirmed.

HANSON, J., concurs.

LARSON, J., concurs in the results.

WOLFE, Justice (concurring in part, dissenting in part).

I concur in the conclusion that the content of understanding between the parties must be gleaned not only from their initial conversations, but also from the evolution of the de-

velopments on the various jobs. The actual work necessitated modifications and changes in detail which were not foreseeable in the original negotiations. The parties agree that the original idea was that the plaintiff should furnish forty per cent of the equipment and defendant sixty per cent, but that in actual practice it could not work with exactitude. The real issue pertains to the question of formula for the division of profits. Since the labor costs, costs of materials, supervision and office expense were all deducted from the gross, the issue really revolved about how recompense should be made for the use of machinery furnished by each. Defendant contended for two propositions: First, that in determining what equipment was furnished two elements were to be considered. (a) Value of equipment furnished whether cost, market or inventory, and the time it was furnished and that the value of each piece should be multiplied by the number of units of time and the addition of all these ("weighted values") for each party would give the comparison of what each furnished. The second proposition it contended for was that the profits of any job should be divided in this proportion. To illustrate the contention concretely: Plaintiff furnishes on a certain job a steam shovel valued at $10,000 for 300 hours and a rock crusher valued at $6,000 for 200 hours. The total weighted value of these would be (10,000 x 300) plus (6,000 x 200) equals 4,200,500. The defendant furnishes a roller valued at $3,000 for 200 hours and a concrete mixer valued at $1,000 for 450 hours. The weighted value of the equipment furnished by it would be (3,000 x 200) plus (1,000 x 450) equals 1,050,-000. The profits under this contention would be divided as 4 is to 1.

The plaintiff contended differently. It argued that the ideal furnishing of equipment was on a 40-60 per cent ratio and that the profits were to be so divided, but that the *actual* furnishing of equipment as it departed from the ideal was to be adjusted to the 40-60 ratio on a rental basis. It could not be adjusted on any other basis. Thus, in the illustration

formerly used, if plaintiff furnished a steam shovel with an hourly rental value of $10 and it were used for 300 hours, it would have a rental charge (not a weighted value) of $3,000 for the steam shovel and for the rock crusher of $1,000, assuming its hourly rental charge to be $5 and it was in use on the job for 200 hours. The total contribution in terms of rental by plaintiff would be, therefore, under the illustration, $4,000. If defendant contributed a roller having a rental value of $3 per hour for 200 hours and a concrete mixer rental value $1 per hour for 400 hours its contribution of equipment in rental value would be $1,000. The plaintiff would then have contributed four times as much as defendant and contended that an adjustment should be made in its favor on the basis of 40-60 contribution. To bring the ratio of contribution to 40-60, the plaintiff must be paid rent for all it has furnished in excess of its forty per cent against defendant's sixty per cent. Defendant's contribution of $1,000 becomes its sixty per cent, and plaintiff's corresponding forty per cent will be 667, and plaintiff will receive rent from gross receipts for its additional 3333.

It can be seen that if defendant's theory is adopted it makes no substantial difference whether weighted value or rental charge is made the formula for division of the profits. The relative weighted values of equipment or relative rental charges for equipment furnished simply determine the division of the profits. The 60-40 ratio is forgotten in this regard. But as to plaintiff it makes much difference. Weighted value which is an abstract figure permitting only a comparison cannot be used as a dollar charge against gross profits, but rental value can. Plaintiff, under its theory, is bound to reject weighted value; whereas defendant is not so much concerned as to whether rental or weighted value is taken so long as the gross profits are divided according to the ratio of the two without allowing a charge against the proceeds for rental of machinery before division. The defendant strongly urged weighted value as the measure of equipment contribution because if it were adopted it would make sure

that its theory of dividing profits according to the actual proportion of equipment furnished would be adopted. But it was about equally well off when the court divided the profits measured by the proportional contribution of equipment in turn measured by the rental charge. But plaintiff was obliged to contend for rental charge, not because it believed the profits should be divided in the ratio of which the rental charge of one bore to the rental charge of the other, but because as above stated and illustrated it was contending for a more fundamental proposition, to-wit: That after adjusting contributions of machinery to the ideal 60-40 ratio, the excess which each party contributed over ideal percentage should be a *charge* against the gross income and after that what profits remained should be divided on a 60-40 basis.

This gives an added significance to the question of whether equipment bought during jobs for the jobs was to be considered as owned jointly or by the party which actually advanced the money. If owned singly, the equipment would vary the division of profits.

The preliminary explanation above given will, it is hoped, lend some intelligence to the conclusions reached in this opinion. The lower court accepted the defendant's theory that not the ideal ratio of 60-40 was to govern distribution of profits, but the actual ratio of contribution of equipment which it found on the Utah-Idaho jobs to be in the ratio of 37-63, excluding equipment owned jointly. In arriving at this ratio it lumped all of the eight Utah-Idaho jobs together, treating them as one big job and found that defendant had *in rental value* contributed $13,546.21, and the plaintiff $23,268.90, or a total of $36,845.11, which made the contribution of defendant 37 per cent and the contribution of plaintiff 63 per cent. (Finding No. 5) Thus it may be seen that the court accepted plaintiff's theory as to the measuring rod, i. e., rental value, but defendant's theory that profits should be divided not according to the ideal ratio, but according to the actual ratio of contribution.

I think there is evidence to support the lower court in its conclusion that profits should be divided according to what the actual ratio of contribution was and not according to the ideal ratio of contribution. Furthermore, I see no error in taking the rental rather than the weighted value as the formula for division and indeed, respondent is not seriously objecting to that criterion. I think Findings Nos. 9, 10, 11, 12, 13, and 14 were supported by evidence or by reasonable inferences therefrom. These findings pertain to what was jointly and separately purchased.

I find nothing arbitrary in excluding the Adams grader and McCormick unit from joint ownership as found in Finding No. 12. The court had a mass of evidence before it. It made a sincere effort to piece together conflicting evidence into a reasonably harmonious whole and to arrive at the real intention of the parties from evidence which threw little light on either theory.

I concur with the observation of the prevailing opinion that since defendant's theory was adopted there may not be any substantial difference between using rent value or weighted value as the formula for division of profits, but I think that intrinsically there might be considerable difference. Value multiplied by time equals weighted value. Rental charge per unit of time multiplied by the number of time units for which rented equals total rental charge. True, the rental charge is based on value or investment, but it also involves factors such as rate of depreciation, obsolescence, idle time when equipment is not in use when owner is entitled to interest on its investment, etc. These factors are not embraced in weighted value.

I hardly think the Austin contract (in Nevada) is given adequate treatment in the prevailing opinion. The court found this to be a joint enterprise and that it was sublet to the Heiselt Construction Company (Finding No. 6) and that the net profit on it was $3,019.51 (Finding No. 15) which the court divided 40-60. The gross profit on this contract was $12,419.54, but Heiselt failed to complete the job

so respondent did so at a cost of $9,400.12, which was deducted from the gross profit. Heiselt already owed respondent $31,611.33 to which the $9,400.12 was added. Heiselt later repaid part of this total, leaving unpaid $12,203.20. All of Heiselt's payments were applied to his individual indebtedness to respondent. Appellant claims the payments of Heiselt should have been applied pro rata on respondent's debt and on the debt appellant was interested in. Respondent contended that the moneys paid by Heiselt should be applied to the oldest debts first. I think appellant's contention is correct. The court will apply payments in such manner as will effectuate equitable principles. *United States* v. *Kirkpatrick,* 9 Wheat. 720, 737, 6 L. Ed. 199; *Korbly* v. *Springfield Institute for Savings,* 245 U. S. 330, 336, 38 S. Ct. 88, 62 L. Ed. 326; *Lichtenstein* v. *Grossman Construction Corp.,* 248 N. Y. 390, 162 N. E. 292; *Anspacher* v. *Utterback's Adm'r,* 252 Ky. 666, 68 S. W. 2d, 15; 48 C. J. 655; 21 R. C. L. 97; Restatement of Law, Contracts, Sec. 387; *Colby* v. *Copp,* 35 N. H. 434; *Russell* v. *Green,* 10 Conn. 269; *Boreing* v. *Wilson,* 128 Ky. 570, 108 S. W. 914; 48 C. J. 651, Sec. 99.

The equitable principle here involved is that when A. makes payment to B. on a general account and C. owns part of the account, B. cannot use A.'s payment in toto to reduce A.'s individual indebtedness to him and not apply any of it to that part of the account which C. is interested in when A. does not designate what part of the account the payments are to be applied to. B., because of his strategic position as receiver of the payment from A., cannot divert it solely to his own benefit. He owes C. a duty to treat A.'s undesignated payment pro rata a payment to the part of the account C. is interested in. That is only fair. If A. would prefer application solely to B.'s part of the account and so designate, the case might be different. I see no reason why this principle should not be applied in a case where the profits of the venture have been charged with the advance made by one of the parties and that advancement charged

back to the debtor who owes the one both individually and on behalf of a silent partner, or who owes a trustee both as a trustee and in his individual capacity. The beneficiary should have the advantage of a pro rata application. In the instant case, it is as if the appellant had paid its share of the advancement made by respondent out of its (appellant's) share of the profits. As Heiselt pays respondent on respondent's general account with Heiselt, part of which account appellant is interested in, the payments of Heiselt not designated as to application must be pro-rated in their application.

I hardly think sufficient the point urged by respondent to support its theory that the source of the money with which Heiselt made payments to respondent impressed those payments with a right in respondent to make application to the items of individual indebtedness rather than the one owed jointly to respondent and the undisclosed partner or joint venturer, appellant. Respondent claims that on its own account it sublet to Heiselt certain contracts in California on a favorable basis and guaranteed the performance of them. For this reason it claims the money paid to respondent arising out of profit from these contracts was earmarked in respondent's favor, although there is nothing to show that this was considered when the California contracts were sublet. This entire claim is an extraneous consideration. For the reasons above stated I cannot concur in affirming the court's findings in this branch of the case.

I think there is sufficient evidence to sustain Finding No. 16 that the Wells contract as to the graveling and grading part of construction was a joint venture and also that the net profits from it were $3,089.59 (Finding No. 15) and to sustain the disallowance of two items (Finding No. 17) which reduced the profits to $3,089.59. The Wells job was sublet to the Jeff Hunt Construction Company, respondent to retain for itself and appellant seven per cent of the payments made by the state of Nevada. The graveling portion of the job was approximately $44,000. On the entire

job the Hunt Company lost $19,363.81. The respondent made a voluntary allowance of $3,000 and the balance was entirely paid up by the Hunt Company. Respondent also released Hunt from paying the premium on his bond, amounting to $440. Appellant had nothing to do with either of these releases or allowances and respondent contends only that as a matter of law the action of respondent in making the allowances bound its partner, the appellant.

It is fundamental that although the act of respondent might bind its partner so far as Hunt was concerned, in an accounting between the partners it could have only that effect which the relations and agreements of the partners gave it. Respondent produced no evidence of authority, express or implied, from appellant to make a voluntary release of $3,440 which the Hunt Construction Company was bound by its contract to pay. The trial court found, and correctly, that this was not the act of or binding upon the appellant. The case of *Reiser* v. *Johnston*, 65 Okl. 307, 166 P. 723, L. R. A. 1918A, 924, is not persuasive as against the position of the court and appellant. Its position is supported by Secs. 69-1-6(3), 69-1-15(8), R. S. Utah 1933; *Daniel* v. *Daniel*, 48 Ky. 195, 9 B. Mon. 195; *Lobdell* v. *Slawson*, 90 Mich. 201, 51 N. W. 349; *State ex rel. Crane Co.* v. *Stokke,* S. D., 272 N. W. 811, 819, 110 A. L. R. 761; *Wilson* v. *McKee*, 110 Pa. Super. 544, 549, 168 A. 341 (Real Property)*;* *Scanlon* v. *Kuehn*, 225 App. Div. 256, 232 N. Y. S. 592 (Confession of Judgment). Consequently, respondent's cross-appeal must fail in that regard.

The next question relates to the Arizona jobs. The Arizona statute provides:

"No foreign corporation shall transact any business in this state until it has complied with the requirements of the preceding section, and every act done by said corporation prior thereto shall be void." (Sec. 658, Ch. 14, Rev. Code of Arizona, 1928.)

It was held in *National Union Indemnity Co.* v. *Bruce Bros., Inc.*, 44 Ariz. 454, 38 P. 2d 648, as follows (page 654) :

"It is the duty of the court, whenever the facts which render the contract void are called to its attention, to declare the law, and no party may recover in an action *where the right of recovery must rest in some manner upon the void contract.*" (Italics added.)

Ordinarily, sister states adopt the interpretation and effect of the interpretation of the highest state court of the state owning the law, unless such interpretation conflicts with its own public policy. The plaintiff in its second cause of action, involving a claim for recovery on the Arizona contracts, sues in the first count seemingly on the contract of joint venture. If both plaintiff and defendant carried on the Arizona contracts with the federal government as a joint venture, the plaintiff was doing business without qualifying under the Arizona statutes and the contract was therefore void. The language of the Bruce Case appears to be broad enough to make it void, not only as against the one for whom the work was done (federal government) but as a basis of suit for distribution of the profits. The lower court found that the agreement was joint in Arizona (Finding No. 21) ; that appellant engaged in business there (Finding No. 22) ; that appellant received no license to do business in Arizona (Finding No. 23) and concluded that "the contracts entered into between plaintiff and defendant concerning Arizona jobs were null and void in violation of the laws of the State of Arizona and neither party is entitled to recover against the other for any sums based upon said contracts." There is evidence to sustain this finding that the agreement for joint operations was entered into in Flagstaff, Arizona; that appellant's equipment was moved to Arizona and operated there over a period of twenty months and appellant participated as a joint venturer or partner in establishing a camp and operating it, hiring men, making purchases, preparing and submitting bids for other Arizona projects and prosecuting generally the work connected with highway construction. But I have doubt as to the court's conclusion. Assuming, for the purpose of this opinion, that as to the federal government appellant was doing

business, was it doing business in Arizona so far as respondent was concerned? If the parties had agreed in Arizona to a partnership, certainly the mere agreement would not be doing business in Arizona. If, under the partnership, each should work on different jobs rather than jointly on each job, the partnership agreement being merely to split on a 60-40 ratio the net proceeds from the jobs, could respondent defend on the theory that the partnership agreement was void? In a sense, the work is not carried on in pursuance of the partnership agreement, but in pursuance of agreements with the government. The partnership agreement relates to the division of ultimate profits. I realize a tenable argument may be made either way: But at all events, I cannot conceive that the respondent may unjustly enrich himself at the expense of appellant. I think appellant might at least recover on a quantum meruit. While the contract may be void, the acts done under it are not. The construction was not void. The use of machinery was not void. The contract was void in the sense that it furnished no basis for founding a claim on it. One cannot undo the construction work done under it. I do not think respondent can hide behind the voidness of the contract to defeat appellant from recovering for the use of his equipment. But I have some doubt as to whether a quantum meruit is pleaded. Seemingly the second count of the second cause of action was intended to do so, but it still appears to found the claim on the joint venture agreement. But assuming such matters are to be considered as inducement only and that a quantum meruit is stated, I have doubt whether the assignments raise the question of error in not finding judgment on a quantum meruit. Assignments XV and XVI attack Findings Nos. 21 and 22 on the ground that they are not supported by the evidence. As before stated, I think there is evidence to support them. There should have been assignments asserting error in not finding that even though the joint contract and the business done thereunder was a doing of business by plaintiff in Arizona contrary to the Arizona statutes,

it did not prevent recovery as between plaintiff and defendant on a quantum meruit count and that the court should have found to that effect and found the rental value of plaintiff's equipment and given judgment for it to be taken into account in the general judgment. The assignments do not claim error in failing to so find, but only error in finding as the court did find on the theory that it should have found not a quantum meruit but an alternative agreement in the event the parties did not agree on the list and items of equipment to be furnished by each. I hardly think this assignment presents the question of whether the court erred in not finding a quantum meruit for the rental value of the machinery. It may do so. I think the judgment should be reversed with instructions to modify the judgment; but since my opinion will not be the prevailing opinion, I think it unnecessary to conclude as to whether the assignments presented such question.

FOLLAND, Chief Justice (concurring in part, dissenting in part).

I concur in the views expressed in the opinion of Mr. Justice WOLFE.